IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KEYSHER HENDRIX, | : | CIVIL ACTION NO. |
| | : | 1:18-CV-1224-SCJ-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CIOX HEALTH, | : | **FINAL   REPORT   AND** |
| | : | **RECOMMENDATION ON A MOTION** |
| Defendant. | : | **FOR SUMMARY JUDGMENT** |

Plaintiff Keysher Hendrix filed the above-captioned action *pro se* on March 23, 2018. Plaintiff claims that Defendant CIOX Health, her former employer, discriminated against her on the basis of her race and retaliated against her for making complaints about discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). The action is before the Defendant's Motion for Summary Judgment [62]. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [62] be **GRANTED** and that judgment be entered in favor of Defendant on all of Plaintiff's claims.

## I.   FACTS

In this District, Local Rule 56.1B explains the requirements imposed on each party in asserting and opposing motions for summary judgment. Local Rule 56.1B(1) first explains that to present a proper motion for summary judgment, the

moving party must include a statement of the material facts that it contends are

undisputed:

> A movant for summary judgment shall include with the motion and
> brief a separate, concise, numbered statement of the material facts to
> which the movant contends there is no genuine issue to be tried. Each
> material fact must be numbered separately and supported by a citation
> to evidence proving such fact. The court will not consider any fact:
> (a) not supported by a citation to evidence (including page or paragraph
> number); (b) supported by a citation to a pleading rather than to
> evidence; (c) stated as an issue or legal conclusion; or (d) set out only
> in the brief and not in the movant's statement of undisputed facts.

LR 56.1B(1), NDGa.

Local Rule 56.1B(2)(a)(2) then makes clear that the non-movant must respond

to these facts or they will be deemed admitted:

> This Court will deem each of the movant's facts as admitted unless the
> respondent: (i) directly refutes the movant's fact with concise responses
> supported by specific citations to evidence (including page or
> paragraph number); (ii) states a valid objection to the admissibility of
> the movant's fact; or (iii) points out that the movant's citation does not
> support the movant's fact or that the movant's fact is not material or
> otherwise has failed to comply with the provisions set out in LR 56.1
> B.(1).

LR 56.1B(2)(a)(2), NDGa.

The respondent to a summary judgment motion must include such responses

on an individually numbered basis, with a separate and precise response individually

addressed to every one of the movant's statements of fact that the respondent intends

to dispute. LR 56.1B(2)(a)(1), NDGa. The Local Rules are clear, moreover, that

when the respondent intends to refute the movant's fact, the respondent must support

such refutations with "specific citations to evidence." LR 56.1B(2)(a)(2)(i), NDGa.

The Eleventh Circuit has held that a failure to comply with Local Rule 56.1 is

not a "mere technicality," because "[t]he rule is designed to help the court identify

and organize the issues in the case." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302

(11th Cir. 2009) (*citing Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)).

"Local Rule 56.1 protects judicial resources by 'mak[ing] the parties organize the

evidence rather than leaving the burden upon the district judge.'" *Reese*, 527 F.3d at

1268 (internal quotes and citation omitted); *see also Libel v. Adventure Lands of

America, Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) ("Courts have neither the duty

nor the time to investigate the record in search of an unidentified genuine issue of

material fact to support a claim or defense.").

Thus, it is each party's obligation to cite to evidence in the record that

establishes a triable issue of fact, and the Court cannot cull through the entire record

in an effort to search for evidence that creates a disputed issue. *See United States v.

Adkinson*, 135 F.3d 1363, 1378-1380 (11th Cir. 1998); *Johnson v. City of Ft.

Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997); *see also Dickson v. Amoco

Performance Products, Inc.*, 845 F.Supp. 1565, 1570 (N.D. Ga. 1994) ("It should be

the party's responsibility to direct the court's attention separately to each portion of

the record which supports each of the party's distinct arguments.").

In this case, although Plaintiff has filed a document titled "Plaintiff's Opposition to Defendant's summary judgment And request for oral hearing" [64] ("Pl. Br."), Plaintiff has failed to provide any response to the Defendant's Statement of Material Facts. Although Plaintiff is proceeding in this case without the benefit of counsel, her *pro se* status does not excuse her from needing to follow the same procedural rules as other litigants. *See Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) (a *pro se* litigant "is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure"); *see also Aning v. Fed. Nat'l Mortg. Ass'n,* 663 F. App'x 773, 776 (11th Cir. 2016) (*pro se* parties are required to follow Local Rule 56.1 because it is an "ordinary procedural rule of civil litigation"). The Local Rules are clear that the Court must deem the movant's facts to be admitted unless the respondent files a proper response or objection disputing each fact. LR 56.1B(2)(a)(2), NDGa.

Accordingly, because Plaintiff has failed to file any response to Defendant's submitted facts, the Court deems Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment [62-2] ("Def. SMF") to be admitted in full and, unless otherwise indicated, draws the following facts from Defendant's admitted facts. As indicated and as needed for clarity, the Court also draws some facts from other material in the record. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other

materials in the record."). Unless otherwise noted, the Court has excluded assertions of fact that are presented as arguments or legal conclusions or are not supported by a citation to evidence in the record. *See* LR 56.1B(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . [or] (c) stated as an issue or legal conclusion.") *see also E.E.O.C. v. Atlanta Gastroenterology Associates, LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 (N.D. Ga. Feb. 16, 2007).

The Court has also excluded facts that are "(d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts." *See* LR 56.1B(1), (2)(b), NDGa. The Court has nevertheless viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Defendant CIOX Health ("Defendant" or "CIOX") is a Georgia limited liability company, headquartered in Alpharetta, Georgia. Def. SMF at ¶ 1. CIOX manages patient health information for hospitals and physician practices nationwide and maintains offices nationwide. Def. SMF at ¶ 2. CIOX is an equal opportunity employer and maintains policies and procedures strictly prohibiting discrimination, harassment, and retaliation against all employees based on protected characteristics.

Def. SMF at ¶ 3. Plaintiff began working at CIOX in July of 2015 as a temporary employee through a Staffing Firm in the Release of Information Specialist I ("ROI I") position. Def. SMF at ¶ 4. CIOX hired Plaintiff officially in October of 2015. Def. SMF at ¶ 5. CIOX hired Plaintiff as an hourly employee in the Release of Information Specialist I ("ROI I") position. Def. SMF at ¶ 6. In December of 2015, CIOX changed the ROI I position's title to Client Service Representative I ("CSR I"); the position's duties and pay remained unchanged. Def. SMF at ¶ 7. Plaintiff worked as a CSR I for the remainder of her employment with CIOX. Def. SMF at ¶ 8.

At all times during her employment, Plaintiff served as an at-will employee. Def. SMF at ¶ 9. At the time she began her employment with CIOX, Plaintiff received a copy of CIOX's Employee Handbook. Def. SMF at ¶ 10. When CIOX re-issued its Employee Handbook in Spring 2016, Plaintiff received a copy and attended training on the policies and procedures contained in the handbook. Def. SMF at ¶ 11. Plaintiff reviewed and was aware of CIOX's policy against discrimination, retaliation, and harassment and CIOX's Business Ethics and Conduct policy. Def. SMF at ¶ 12.

CIOX assigned Plaintiff to work on the WellStar Kennestone Hospital Team (the "Team") out of CIOX's office in Alpharetta, Georgia. Def. SMF at ¶ 13. As a CSR I on the Team, Plaintiff's duties included receiving and responding to requests,

such as audits, patient requests, attorney requests, and any other request for protected health information ("PHI"), by opening mail, assisting walk-ins and telephone inquiries, and retrieving facsimile inquiries in a timely manner, among other duties. Def. SMF at ¶ 14. When CIOX officially hired Plaintiff, it hired her to perform all of the duties of the CSR I position. Def. SMF at ¶ 15. At the time CIOX hired Plaintiff, CIOX was not processing audits, and Plaintiff processed other types of requests from the beginning of her employment and throughout her employment. Def. SMF at ¶ 16. CIOX and all CIOX employees, including employees in the CSR I position, have a responsibility to respect and maintain the confidentiality of its customers' PHI, regardless of its form. Def. SMF at ¶ 17. The responsibility to protect PHI includes a duty to comply with not only CIOX's policies and procedures regarding the release of PHI, but also the policies and procedures of its customers and state and federal security and privacy regulations governing the use and disclosure of PHI, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Def. SMF at ¶ 18.

Anthony Daly supervised Plaintiff from the beginning of her employment until her termination. Def. SMF at ¶ 19. Plaintiff received CIOX's mandatory training to comply with HIPAA and all other applicable policies, procedures, and laws regarding the release of PHI. Def. SMF at ¶ 20. WellStar, the CIOX customer for whom Plaintiff worked, also required a training and test of proficiency before

allowing access to their electronic medical records. Def. SMF at ¶ 21. Plaintiff also received training on policies and procedures necessary to perform the duties of the CSR 1 position. Def. SMF at ¶ 22. Daly did not deny training to Plaintiff. Def. SMF at ¶ 23.

In June of 2016, Plaintiff requested to take bereavement leave due to the death of her father. Def. SMF at ¶ 24. Daly approved Plaintiff's request for bereavement leave for five days, which was the maximum number of days allowed under CIOX's policy, and approved of Plaintiff's use of paid time off for any remaining time off she needed. Def. SMF at ¶ 25. After Plaintiff returned from bereavement leave, Plaintiff's productivity decreased (greater than the average decrease among the Team), her processing errors increased, and her demeanor became negative. Def. SMF at ¶¶ 26, 27.

In the summer of 2016, the Team's overall productivity was lower than needed to meet business needs. Def. SMF at ¶ 27. Daly observed that socializing among the Team members, including Plaintiff, was negatively affecting productivity. Def. SMF at ¶ 28. In August of 2016, Daly rearranged the Team's desk assignments in an attempt to increase the Team's productivity. Def. SMF at ¶ 29. Plaintiff's new desk assignment was within the Team area with the other Team members, was not in a corner, and had all working equipment necessary for her to perform her work duties. Def. SMF at ¶ 30. As the Regional Manager of Operations,

Daly's role required him to adjust the Team's productivity standard on a project-by-project basis due to variations in customer records, the types of requests, the productivity of the Team, among other factors for business needs. Def. SMF at ¶ 31. Around the same time that he rearranged desk assignments, Daly also lowered productivity standards for certain types of requests and assignments processed by the Team, not for specific individuals. Def. SMF at ¶ 32.

Also around this time, due to Plaintiff's increased processing errors, Daly provided one-on-one training on processing to Plaintiff and adjusted her assignments in an attempt to reduce her errors. Def. SMF at ¶ 33. After changing the desk assignments, changing her assignments, providing one-on-one processing training from Daly, and adjusting the Team's productivity standard, Plaintiff's productivity improved briefly, but her processing errors continued. Def. SMF at ¶ 34. CIOX did not demote anyone on the Team in August or September of 2016 and did not promote anyone on the Team in 2016. Def. SMF at ¶ 35.

On August 31, 2016, after Daly rearranged desks and lowered productivity standards, Plaintiff made her first complaint about Daly ("August 31 Complaint") in an email to Kristen Griffin, the Regional Director of Operations. Def. SMF at ¶ 36. Plaintiff complained about Daly's management, the "abuse of authority and the hostile environment of the Wellstar team," and the "stressful environment" being overwhelming due to Daly and the loss of her father. Def. SMF at ¶ 36. Plaintiff's

August 31 Complaint did not allege that Daly was engaging in discriminatory, retaliatory, or harassing conduct due to her race or any other protected category. Def. SMF at ¶ 37. After receiving Plaintiff's August 31 Complaint, Griffin responded to Plaintiff and said she would discuss these issues with Daly. Def. SMF at ¶ 38.

On September 1, Griffin reached out to Daly, who responded by explaining that Plaintiff was upset that he reassigned her desk, that he reassigned desks to increase productivity, that Plaintiff's productivity had increased since the reassignment, that Plaintiff was still making processing errors even after training, and that he and Plaintiff discussed her issues that day and agreed on how to improve the work environment. Def. SMF at ¶ 39. On September 10, 2016, Plaintiff forwarded an email from Daly about her failing to meet productivity to Tim Engelbracht, the Vice President of Operations, again complaining of work stress caused by Daly and the loss of her father ("September 10 Complaint"). Def. SMF at ¶ 40. Plaintiff's September 10 Complaint did not allege that Daly was engaging in discriminatory, retaliatory, or harassing conduct due to her race or any other protected category. Def. SMF at ¶ 41.

On September 12, 2016, Plaintiff submitted a substantively similar complaint to CIOX's Human Resources ("HR") and to Sharon Spivey (now Sharon Miley), the Regional HR Manager at that time, complaining that Daly's hostility and management and the recent death of her father were causing her stress at work

("September 12 Complaint"). Def. SMF at ¶ 29. Plaintiff's September 12 Complaint did not allege that Daly was engaging in discriminatory, retaliatory, or harassing conduct due to her race or any other protected category. Def. SMF at ¶ 44. After Plaintiff's September 12 Complaint, Miley spoke to Plaintiff to ask for more details, and Plaintiff explained that Daly instructed her to stop using a coversheet when processing requests, but Plaintiff believed that the coversheet was needed to protect PHI. Def. SMF at ¶ 45. Miley investigated and concluded that Daly's instructions were correct. Def. SMF at ¶ 45.

On October 13, 2016, Plaintiff emailed Miley ("October 13 Complaint"), stating that the issues were continuing and "now the problems is [sic] founded in retaliation and grounded in discrimination." Def. SMF at ¶ 46. Plaintiff also requested the address where she should send a formal grievance. Def. SMF at ¶ 46. On October 13, 2016, Miley replied to Plaintiff in email, providing her with the option to email her grievance to her directly and also providing her mailing address if she wanted to mail it. Def. SMF at ¶ 47. She also explained that she had spoken to Daly and his supervisor, Griffin, and confirmed that Daly's instruction regarding the coversheet was correct. Def. SMF at ¶ 47. Plaintiff replied, stating that her complaint was that Daly was abusing his authority, causing a hostile environment, was treating her (an African-American) differently from a White co-worker with respect to productivity standards, and changed her job duties without training. Def. SMF at

¶ 48. Plaintiff stated she would go into more detail in her formal grievance. Def. SMF at ¶ 48. Miley did not receive such formal grievance in the mail or email from Plaintiff, and CIOX does not have a record of receiving such formal grievance sent via certified mail from Plaintiff. Def. SMF at ¶ 49.

Plaintiff took FMLA leave from October 24, 2016, through November 7, 2016. Def. SMF at ¶ 50. In November of 2016, when Plaintiff returned to work, Miley met with Plaintiff about her October 13 Complaint. Def. SMF at ¶ 51. Plaintiff alleged that: (1) Daly was showing favoritism to the White employees with respect to productivity standards and overtime pay; (2) Daly was showing favoritism to Hoor Kapadia (who is Asian), another employee on her team, with respect to discipline for sleeping at her desk and/or taking long lunch breaks; (3) Daly interrupted Plaintiff and became upset with her during a team meeting about the use of a coversheet; and (4) Daly changed her job duties from audits to processing medical records without providing training, which caused her to have two unauthorized disclosures ("UADs"). Def. SMF at ¶ 52.

In response to Plaintiff's complaint, in November and early December, Miley interviewed Daly, five other employees on the team, and reviewed overtime pay records. Def. SMF at ¶ 53. Miley and Arlainna Thomas, the Director of Human Resources at that time, informed Daly that they would be interviewing members of the Team about Plaintiff's complaint and reminded him that retaliation in any form

was strictly prohibited. Def. SMF at ¶¶ 54, 98. Based on the information collected in her investigation, Miley determined that Plaintiff's allegations of discrimination, harassment, and retaliation were unfounded. Def. SMF at ¶ 55. The investigation determined that Plaintiff received sufficient materials, training, and equipment to perform her work tasks, even after Daly changed her assignments. Def. SMF at ¶ 56. The investigation determined that Plaintiff received training on ROI (Release of Information) Policies and Procedures in September 2016. Def. SMF at ¶ 57. The investigation determined that Daly changed her assignments due to her processing errors and two UADs that Plaintiff caused. Def. SMF at ¶ 58.

The investigation also determined that Daly was unaware of Plaintiff's October 13 Complaint until November 3, after he changed her assignments and discovered the UADs. Def. SMF at ¶ 59. The investigation determined that, from January to October of 2016, the two White employees and the one Asian employee on the WellStar team received less overtime pay than Plaintiff and many of the other non-White employees on the team. Def. SMF at ¶ 60. The investigation determined that Daly offered overtime to the entire WellStar team to meet business needs; however, when team members had very low productivity and/or were not processing correctly, overtime was not approved. Def. SMF at ¶ 61.

Based on her interviews of Daly and other employees, Miley concluded that both Plaintiff and Daly acted inappropriately during a team meeting when he and

Plaintiff disagreed over the use of a coversheet in processing; no one, including Plaintiff, indicated that Daly made any comments regarding Plaintiff's race. Def. SMF at ¶ 62. Miley later had a conversation with Daly about his behavior during the team meeting and acting more professionally. Def. SMF at ¶ 62. Daly did not make any racial remarks to Plaintiff when he was her supervisor and Plaintiff never heard Daly make any racial remarks to anyone. Def. SMF at ¶ 63. Miley also believed that Plaintiff's complaint about her co-worker Kapadia's sleeping at her desk and made Daly aware of the report. Def. SMF at ¶ 64. Miley informed Plaintiff of the results on each issue. Def. SMF at ¶ 65.

On or about October 4, 2016, Daly received notice from CIOX's Customer Service and/or Compliance Department that Plaintiff made a potential unauthorized disclosure ("UAD") of PHI while processing a request for information on September 28, 2016. Def. SMF at ¶ 66. After receiving such notice, pursuant to company protocol, Daly investigated and determined that Plaintiff made a UAD when processing the request, resulting in a HIPAA violation and breach of CIOX's policies regarding the release of PHI. Def. SMF at ¶ 67. Plaintiff was working on or around September 28, 2016 at the time the request was processed. Def. SMF at ¶ 68.

Pursuant to company protocol, Daly notified the customer and CIOX's Human Resources of the UAD. Def. SMF at ¶ 69. Daly also counseled Plaintiff on her failure to perform CIOX's quality assurance procedures and to comply with

CIOX's policies and HIPAA regulations. Def. SMF at ¶ 70. When team members cause UADs or make processing errors, it affects Daly's performance review negatively; therefore, it is in his best interest to help the WellStar team reduce UADs and other processing errors. Def. SMF at ¶ 71. The counseling form assigned two points for this breach. Def. SMF at ¶ 72. Associates are permitted up to twelve points for breaches in a twelve-month time period. Def. SMF at ¶ 73.

Shortly thereafter, on or around October 25, 2016, Daly received notice from CIOX's Customer Service Department and/or Compliance Department that Plaintiff made another potential UAD of PHI while processing a request for information on or around October 7, 2016. Def. SMF at ¶ 74. After receiving the notice, Daly investigated and determined that Plaintiff made a UAD when processing this request as well, resulting in a second HIPAA violation and breach of CIOX's policies regarding the release of PHI. Def. SMF at ¶ 75. Plaintiff was working on or around October 7, 2016. Def. SMF at ¶ 76. As a result, Daly notified the customer and CIOX's Human Resources about the UAD. Def. SMF at ¶ 77.

Because it was Plaintiff's second UAD, Daly issued a written warning to Plaintiff upon her return from leave on November 7, 2016, for her failure to perform CIOX's quality assurance procedures and to comply with CIOX's policies and HIPAA regulations. Def. SMF at ¶ 78. The written warning assigned two points for this breach, bringing Plaintiff's breach point total to four points. Def. SMF at ¶ 79.

Daly also assigned Plaintiff with re-training on breach prevention, CIOX's quality assurance procedures, and HIPAA regulations as a result of this UAD, but Plaintiff never completed the training. Def. SMF at ¶ 80. Due to Plaintiff's processing errors and unauthorized disclosures, Daly changed Plaintiff's work assignments with training in an attempt to reduce her errors; the assignments were within the CSR role. Def. SMF at ¶ 81.

On November 1, 2016, Daly emailed Miley, explaining Plaintiff's processing errors and recent UAD and requesting to change her schedule so that he could assign her to a customer service line. Def. SMF at ¶ 82. Miley responded to Daly on November 3, informing him for the first time that Plaintiff had filed another complaint against him, referring to Plaintiff's October 13 Complaint of discrimination. Def. SMF at ¶ 83. CIOX never demoted Plaintiff, assigned duties to Plaintiff outside of the CSR position, or decreased Plaintiff's pay. Def. SMF at ¶¶ 84-86.

On the afternoon of December 15, 2016, Plaintiff was working overtime approved by Daly. Def. SMF at ¶ 87. This was Plaintiff's third time of working overtime approved by Daly within a week. Def. SMF at ¶ 87. On the afternoon of December 15, 2016, Plaintiff and Hoor Kapadia, another CSR I on the WellStar Team, were involved in an altercation at work in the WellStar Team area. Def. SMF at ¶ 88. Plaintiff walked over to Kapadia's desk where Kapadia was seated and stood

at Kapadia's desk during the altercation while Kapadia remained seated. Def. SMF at ¶¶ 89-90. Plaintiff told Kapadia that they should "take this outside" or "step outside." Def. SMF at ¶ 91. Kapadia told Plaintiff she did not want to step outside, and Plaintiff went back to her desk. Def. SMF at ¶ 92. Kapadia perceived Plaintiff's statement and conduct as a threat of physical violence. Def. SMF at ¶ 93.

Tanya Lee, the Team's Site Supervisor, witnessed part of the incident and contacted Daly, who was not in the office that afternoon, to inform him about the altercation. Def. SMF at ¶ 94. Daly called both Kapadia and Plaintiff and sent them home that same day on suspension with pay until HR could investigate the incident. Def. SMF at ¶ 95. Daly emailed Miley to inform her that he sent both Plaintiff and Kapadia home because of a disruptive argument at work. Def. SMF at ¶ 96. That same afternoon, Ashley Griffin, an employee on the Team, sent an email to Daly about the altercation, describing what she witnessed. Def. SMF at ¶ 97. Daly forwarded Griffin's statement to Miley, who forwarded it to Arlainna Thomas, the Director of Human Resources. Def. SMF at ¶ 98. On the same or next day, Thomas and Miley called Plaintiff to ask her what happened in the altercation. Def. SMF at ¶ 99.

On December 16, 2016, Kapadia emailed Daly, providing a statement about the altercation, complaining about previous instances of Plaintiff's harassing and bullying her, and stating that she did not feel safe returning to work. Def. SMF at

¶ 100. Daly forwarded Kapadia's email to Miley. Def. SMF at ¶ 101. Over the next two or three days, Thomas and Miley also interviewed Kapadia and the employees who witnessed the incident. Def. SMF at ¶ 102. Thomas reached out to Daly to discuss the "outburst" that had occurred, but Daly informed her that he did not witness the incident. Def. SMF at ¶ 103. The employee witnesses and Kapadia consistently informed Thomas and/or Miley that Plaintiff approached Kapadia at her desk, initiated the altercation, used threatening body language by standing close or over Kapadia, who was seated at her desk, made a verbal threat to Kapadia about settling the argument outside, and raised her voice. Def. SMF at ¶ 104.

Due to the consistent accounts from the witnesses, Thomas and Miley decided to terminate Plaintiff's employment for her misconduct that violated CIOX's Business Ethics and Conduct Policy. Def. SMF at ¶ 105. Both Thomas and Miley are African American. Def. SMF at ¶ 106. Thomas and Miley also decided to issue a Final Written Warning to Kapadia for her involvement. Def. SMF at ¶ 107. Daly was not involved in the investigation into the altercation or the decision to terminate Plaintiff and discipline Kapadia. Def. SMF at ¶ 108.

CIOX terminated Plaintiff's employment with CIOX on December 20, 2016. Def. SMF at ¶ 109. On December 20, 2016, Miley called Plaintiff and informed her that her employment was terminated due to her gross misconduct on December 15, 2016. Def. SMF at ¶ 110. No one ever informed Plaintiff that her employment was

being terminated due to her race or due to her complaints. Def. SMF at ¶ 111. Kapadia received a Final Written Warning for her involvement in the altercation with Plaintiff that included counseling on adhering to CIOX's time, attendance, and conduct policies. Def. SMF at ¶ 112. Following Plaintiff's termination, on June 15, 2017, CIOX hired a new CSR I, David Hawthorne, an African American male, to replace Plaintiff on the WellStar team. Def. SMF at ¶ 113.

On January 24, 2017, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, racial harassment, and retaliation for her complaints about racial discrimination and harassment. Def. SMF at ¶ 114; *see* EEOC Charge, attached to Compl. [2], at 8. Prior to the completion of the EEOC investigation, the EEOC issued Plaintiff's Right to Sue letter upon her request. Def. SMF at ¶ 115; *see* Notice of Right to Sue dated January 30, 2018, attached to Compl. [2], at 7.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v.*

*S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477

20

U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

B.   *Plaintiff's Claims*

In the Plaintiff's Complaint, she alleges that Defendant CIOX subjected her to race discrimination and retaliation, in violation of Title VII. *See* Compl. [2] at 4. When asked to state the factual basis of her claims, Plaintiff failed to include any response. *See id*. at 4, ¶ E. Plaintiff attached a copy of her EEOC Charge, however, in which she alleged as follows:

> I was subjected to different terms and conditions of employment by Anthony Daly, Regional Manager of Operations in that I was denied overtime, while my Caucasian counterparts were granted overtime. Mr. Daly also subjected me to a hostile work environment when he changed me from audits to disability and patient request without training and moved my desk to a corner, facing the wall. I began complaining to Human Resources around August 31, 2016. I filed a formal written complaint on September 24, 2016. On December 14, 2016, Earlene Thomas, HR Director informed me that I was suspended pending investigation. On December 20, 2016, Ms. Thomas and Sharon Spivey, Regional HR Manager informed me that I was discharged.
>
> I was told that I was discharged for gross misconduct.
>
> I believe that I was discriminated against due to race (African American) and in retaliation for my protected complaints, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Pl. EEOC Charge, attached to Compl. [2], at 8.

Accordingly, construing the Plaintiff's Complaint liberally to include the allegations in her EEOC Charge, the Court infers that Plaintiff has asserted Title VII claims of race discrimination based on both disparate treatment and a hostile work environment, and unlawful retaliation.

1.    Race Discrimination

a.    Standards of Proof under Title VII

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim for discrimination based on disparate treatment, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Evidence, Black's Law Dictionary* 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). "[D]irect evidence relates to actions or statements of an employer

reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641–42 (11th Cir. 1998). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence.

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*,

411 U.S. at 802; *see also Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310–11; *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253–54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253–54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148

(2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Indeed, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

A plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). The Eleventh Circuit has held that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union*

*City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators," a plaintiff will survive summary judgment if they present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Lewis*, 934 F.3d at 1185. In any event, the "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Nix*, 738 F.2d at 1184 (quoting *Aikens*, 460 U.S. at 713–14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

b.      Disparate Treatment

In the Complaint, Plaintiff alleges generally that CIOX discriminated against her on the basis of her race (African American). *See* Compl. [2] at 4. In her EEOC Charge, she alleges more specifically that she was "subjected to different terms and conditions of employment" by Daly, in particular contending that she was "denied overtime, while my Caucasian counterparts were granted overtime." Pl. EEOC Charge, attached to Compl. [2], at 8. Plaintiff also complains that Daly "changed me from audits to disability and patient request without training and moved my desk to a corner, facing the wall." *Id*. It appears that Plaintiff is also contending that CIOX discriminated against her on the basis of her race when it terminated her employment. *See id*.

27

Plaintiff does not contend that she has produced direct evidence of any discriminatory intent, and the undersigned finds that she has not done so. Based on the Defendant's facts that have been deemed admitted, it is undisputed that Daly did not make any racial remarks to Plaintiff when he was her supervisor and Plaintiff never heard Daly make any racial remarks to anyone. Def. SMF at ¶ 63. Plaintiff has not cited to any record evidence that may be considered direct evidence of race discrimination. Thus, Plaintiff's claims of race discrimination rest purely on circumstantial evidence and will be analyzed under the *McDonnell Douglas-Burdine* framework.

Under that framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: 1) she is a member of a protected class; 2) she was subjected to an adverse employment action by her employer; 3) she was qualified to do the job in question, and 4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different race) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Defendant does not dispute that Plaintiff, who is African-American, is a member of a protected class, and that she was qualified for the job she performed while employed by CIOX. Defendant argues, however, that Plaintiff cannot establish

28

a *prima facie* case of race discrimination under the *McDonnell Douglas* framework. First, Defendant argues, some of the alleged actions that Plaintiff complains about are not actually "adverse actions" under Title VII. In particular, the Defendant contends that Plaintiff's complaints that Daly "changed me from audits to disability and patient request without training and moved my desk to a corner, facing the wall" do not rise to the level of adverse employment actions under Title VII. *See* Pl. EEOC Charge, attached to Compl. [2], at 8. The undersigned agrees.

Under the law of the Eleventh Circuit, for an employment action to be considered an "adverse action" that triggers liability, the decision must work a *material* alteration on the terms of employment. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way"). In general, courts have recognized that managers require broad discretion to distribute duties as they see fit, and absent extreme circumstances should not be forced to justify each assignment of job duties or responsibilities in front of a jury. *See, e.g., Shannon v. BellSouth Telecomm.*, 292 F.3d 712, 714-15 (11th Cir. 2002) (reassignment to position in which it was more difficult to meet performance criteria was not adverse employment action); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 588 (11th Cir. 2000) (allegation that professor was denied

desired teaching assignments was not adverse employment action, absent evidence that she was somehow entitled to those courses or that other professors were allowed to pick their assigned classes). Thus, the law in the Eleventh Circuit is that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a *significant* change in benefits." *Davis*, 245 F.3d at 1239 (emphasis in original).

In this case, Plaintiff contends that CIOX discriminated against her on the basis of her race when Daly "changed me from audits to disability and patient request without training," and when he "moved my desk to a corner, facing the wall." Pl. EEOC Charge, attached to Compl. [2], at 8. Plaintiff has not cited to any evidence that her change in assignments from "audits to disability and patient request without training" affected her compensation or benefits in any way, nor has she cited to any other evidence demonstrating that this change was a material and significant change in her working conditions.

Similarly, Plaintiff has also not cited to any record evidence that Daly's decision to move her desk was a significant and material change to her working conditions, nor has she cited to any evidence that the decision to move her desk was related to her race in any way. As set forth in the facts above, it is undisputed that, because Daly observed that socializing among the Team members, including

Plaintiff, was negatively affecting productivity, in August of 2016, he rearranged the Team's desk assignments in an attempt to increase the Team's productivity. Def. SMF at ¶¶ 28-29. It is also undisputed that Plaintiff's new desk assignment was within the Team area with the other Team members, was not in a corner, and had all working equipment necessary for her to perform her work duties. Def. SMF at ¶ 30. Accordingly, the undersigned finds that Plaintiff has failed to establish a *prima facie* case of race discrimination with regard to a change in work assignments or the change in the location of her desk.

Second, Defendant argues, with respect to Plaintiff's complaints about overtime, the Plaintiff cannot establish a *prima facie* case of race discrimination because the undisputed evidence demonstrates that she was not denied overtime. Plaintiff alleges in her EEOC Charge that she was "subjected to different terms and conditions of employment" by Daly when she was "denied overtime, while my Caucasian counterparts were granted overtime." Pl. EEOC Charge, attached to Compl. [2], at 8. As set forth above, the undisputed evidence demonstrates that, in response to Plaintiff's complaint, in November and early December, Miley interviewed Daly, five other employees on the team, and reviewed overtime pay records. Def. SMF at ¶ 53. Based on the information collected in her investigation, Miley determined that, from January to October of 2016, the two White employees and the one Asian employee on the WellStar team received less overtime pay than

31

Plaintiff and many of the other non-White employees on the team. Def. SMF at ¶ 60. The investigation determined that Daly offered overtime to the entire WellStar team to meet business needs; however, when team members had very low productivity and/or were not processing correctly, overtime was not approved. Def. SMF at ¶ 61.

Plaintiff has not cited to any evidence disputing the Defendant's evidence that Plaintiff received more overtime pay than the White and Asian employees on the WellStar team. Moreover, she has not cited to any other evidence that she was denied overtime when similarly situated employees outside her protected class were granted overtime. Accordingly, Plaintiff has failed to establish a *prima facie* case of race discrimination based on the alleged denial of overtime pay.

Finally, Defendant argues that Plaintiff cannot establish a *prima facie* case of race discrimination based on the termination of her employment. Although Defendant does not dispute that the termination of Plaintiff's employment was an adverse employment action under Title VII, Defendant argues that Plaintiff cannot show that CIOX treated any similarly situated employee outside her protected class more favorably than it treated her when it made the decision to terminate her employment. Def. Br. [62-1] at 11-12. Again, the undersigned agrees with Defendant and finds that Plaintiff has failed to establish a *prima facie* case of race discrimination.

A plaintiff alleging discriminatory discharge under Title VII may ordinarily establish a *prima facie* case by presenting evidence that she was replaced by someone outside her protected class. *See Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989); *see also McDonnell Douglas Corp.*, 411 U.S. at 802. In this case, it is undisputed that, following Plaintiff's termination, on June 15, 2017, CIOX hired a new CSR I, David Hawthorne, an African American male, to replace Plaintiff on the WellStar team. Def. SMF at ¶ 113. Thus, Plaintiff cannot show that she was replaced by someone outside her protected class because the person who replaced her was also an African-American.

When a plaintiff is unable to show that she was replaced by someone outside her protected class, she may also establish a *prima facie* case of discrimination under Title VII by showing that her employer treated a similarly situated person outside her protected class more favorably than it treated her under similar circumstances. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Knight v. Baptist Hospital of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1185 (11th Cir. 1984).

"When evaluating an allegation of disparate treatment," courts "require that a comparator be similarly-situated to the plaintiff in all relevant respects." *Stone &*

*Webster Constr. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (quotations and citation omitted). Indeed, the comparator employee "must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). "Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not 'similarly situated' for purposes of establishing a *prima facie* case." *Brown v. Jacobs Eng'g, Inc.*, 401 F. App'x 478, 480 (11th Cir. 2010). Courts also consider whether the plaintiff and the proffered comparator were employed for similar periods. *See Roy v. Broward Sheriff's Office*, 160 F. App'x 873, 875 (11th Cir. 2005) (finding that proffered comparator was not similarly situated because comparator had been with department for sixteen years, while plaintiff had less than 18 months of service).

Courts consider whether the proffered comparator had the same supervisor, *see Morris v. Potter*, 251 Fed. App'x 667, 668-669 (11th Cir. 2007), as well as the type of position the plaintiff holds and the content of the plaintiff's work. *See Simionescu v. Bd. of Tr. of the Univ. of Alabama*, 482 F. App'x 428, 430-431 (11th Cir. 2012) (finding that two university faculty members were not similarly-situated because one was not tenure-track, while plaintiff was, and second faculty member taught in a different department than did plaintiff). Finally, courts also consider whether the plaintiff and the proffered comparator were employed for similar

periods and whether they had similar records of performance. *See Jarvis v. Siemens Med. Solutions USA, Inc.*, 460 Fed. App'x 851, 857-858 (11th Cir. 2012) (minority plaintiff failed to show that Caucasian coworker qualified was similarly-situated because the record showed plaintiff had several significant employment performance deficiencies not seen in Caucasian employee's record); *Roy v. Broward Sheriff's Office*, 160 Fed. App'x 873, 875 (11th Cir. 2005) (proffered comparator was not similarly situated because comparator had been with department for sixteen years, while plaintiff had less than eighteen months of service).

In *Lewis v. City of Union City*, the Eleventh Circuit expounded on the importance of robust comparison evidence for plaintiffs proceeding under the *McDonnell Douglas* framework. *Lewis v. City of Union City*, 918 F.3d 1213, 1221-24 (11th Cir. 2019). Evidence that an employer "has treated like employees differently" is necessary to "supply the missing link and provide a valid basis for inferring unlawful *discrimination*" through use of the framework. *Id.* at 1223 (emphasis in original). A plaintiff is "like" other employees only when "she and her comparators are similarly situated in all material respects." *Id.* at 1224. While a plaintiff need not show that she and her comparator are "nearly identical" in their circumstances, they should be similar in the legitimate circumstances that may have factored into their employer's decision to act adversely toward them, such as their conduct, their work histories, and the policies under which they operate. *See id.* at

1225–28. Without such a comparator, a plaintiff cannot generally establish a *prima facie* case under the *McDonnell Douglas* framework. *Id.* at 1224.

In this case, Defendant argues, Plaintiff has not cited to any evidence that any similarly situated person outside her protected class engaged in similar misconduct, but was not terminated as a result. Defendant argues specifically that Hoor Kapadia, who is Asian, cannot be considered a relevant comparator, although the incident that led to Plaintiff's termination involved both Plaintiff and Kapadia, because the undisputed evidence shows that it was Plaintiff, not Kapadia, who violated CIOX's conduct policy by using threatening language. Def. Br. at 11-12.

The evidence regarding the Plaintiff's altercation with Kapadia is set forth above in the facts. In summary, on December 15, 2016, Plaintiff walked over to Kapadia's desk where Kapadia was seated and stood at Kapadia's desk during the altercation while Kapadia remained seated. Def. SMF at ¶¶ 87-90. Plaintiff told Kapadia that they should "take this outside" or "step outside." Def. SMF at ¶ 91. Kapadia told Plaintiff she did not want to step outside, and Plaintiff went back to her desk. Def. SMF at ¶ 92. Kapadia perceived Plaintiff's statement and conduct as a threat of physical violence. Def. SMF at ¶ 93. Tanya Lee, the Team's Site Supervisor, witnessed part of the incident and contacted Daly, who was not in the office that afternoon, to inform him about the altercation. Def. SMF at ¶ 94. Daly called both Kapadia and Plaintiff and sent them home that same day on suspension

36

with pay until HR could investigate the incident. Def. SMF at ¶ 95. Daly emailed Miley to inform her that he sent both Plaintiff and Kapadia home because of a disruptive argument at work. Def. SMF at ¶ 96.

Thomas and Miley then conducted an investigation, including interviewing Plaintiff and Kapadia, as well as the employees who witnessed the incident. Def. SMF at ¶ 102. The employee witnesses and Kapadia consistently informed Thomas and/or Miley that Plaintiff approached Kapadia at her desk, initiated the altercation, used threatening body language by standing close or over Kapadia, who was seated at her desk, made a verbal threat to Kapadia about settling the argument outside, and raised her voice. Def. SMF at ¶ 104. Due to the consistent accounts from the witnesses, Thomas and Miley, who are both African-American, decided to terminate Plaintiff's employment for her misconduct that violated CIOX's Business Ethics and Conduct Policy. Def. SMF at ¶¶ 105-06. Thomas and Miley also decided to issue a Final Written Warning to Kapadia for her involvement. Def. SMF at ¶ 107. Daly was not involved in the investigation into the altercation or the decision to terminate Plaintiff and discipline Kapadia. Def. SMF at ¶ 108. CIOX terminated Plaintiff's employment with CIOX on December 20, 2016. Def. SMF at ¶ 109.

In sum, Defendant argues, because the undisputed evidence indicates that Plaintiff was the only person who used threatening language, while Kapadia did not, Plaintiff has failed to show that Kapadia's conduct was similar to Plaintiff's conduct.

As a result, Defendant argues, the Plaintiff cannot point to Kapadia as a relevant comparator for the purpose of her claim of race discrimination. The Court agrees. Plaintiff has not cited to any record evidence indicating that Kapadia's conduct was similar to her own.

Moreover, it is undisputed that the employees who witnessed the incident, as well as Kapadia, consistently informed Thomas and/or Miley that it was Plaintiff who approached Kapadia at her desk, initiated the altercation, used threatening body language by standing close or over Kapadia, made a verbal threat to Kapadia about settling the argument outside, and raised her voice. Def. SMF at ¶ 104. Thus, based on the information obtained by Thomas and Miley during the investigation, the Defendant has shown that it had a legitimate reason to terminate Plaintiff's employment that was unrelated to her race, and Plaintiff has failed to cite to any record evidence suggesting that her race had anything to do with the decision to terminate her employment, or any other evidence that suggests that the Defendant's reason for terminating her employment was a pretext to disguise unlawful race discrimination.

Recently, the Eleventh Circuit has reiterated that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City* ("*Lewis II*"), 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators," a plaintiff will

survive summary judgment if they present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Lewis II*, 934 F.3d at 1185. This can "be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent may be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)). While the "convincing mosaic" method bears similarities to the *McDonnell Douglas* method, it operates as a totality-of-circumstances test rather than a rigid step-by-step analysis.

In this case, however, Plaintiff has not cited to any evidence of either a relevant comparator, or any other evidence that could be viewed as a "convincing mosaic of circumstantial evidence" suggesting that the Defendant's decision to terminate her employment was motivated by an intent to discriminate against her on the basis of her race. As a result, Plaintiff cannot establish a *prima facie* case of race discrimination based on the termination of her employment.

Accordingly, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [62] be **GRANTED** as to Plaintiff's claim of race discrimination based on disparate treatment.

c.    Hostile Work Environment

In the Complaint, Plaintiff alleges generally that CIOX discriminated against her on the basis of her race (African American). *See* Compl. [2] at 4. In her EEOC Charge, she alleges that Anthony Daly "subjected me to a hostile work environment when he changed me from audits to disability and patient request without training and moved my desk to a corner, facing the wall." Pl. EEOC Charge, attached to Compl. [2], at 8. Plaintiff also testified during her deposition that she believed that Daly created a hostile work environment when he yelled at her during a meeting. *See* Pl. Dep. [62-4] at 166 ("Everything that was leading up to all these incidents was harassment. Having me in the meeting and trying to downplay or try to embarrass me in front of my coworkers with yelling and, you know, it's just all could've been done—handled differently, because that's not the way you're supposed to handle things in a professional environment.").

The Court infers that Plaintiff has asserted a Title VII claim of race discrimination based on a racially hostile work environment against Defendant CIOX. Defendant argues that Plaintiff has failed to present sufficient evidence to establish a *prima facie* case of race discrimination based on a hostile work environment. Def. Br. at 22-24. The undersigned agrees.

An employer is liable for a violation of Title VII based on sexual or racial harassment when the harassing conduct "unreasonably interferes with an employee's

40

job performance by creating a hostile, intimidating, or offensive work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986). In order to establish a *prima facie* case for a Title VII claim against an employer for a hostile work environment based on harassment, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race (or sex or another protected class under Title VII); (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

To demonstrate the fourth element of a *prima facie* case of a hostile work environment, a plaintiff must show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances" in determining whether a hostile environment is severe or pervasive enough to be actionable under Title VII; it must

consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris*, 510 U.S. at 23.

As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). In evaluating whether a reasonable person would find conduct to be sufficiently severe or pervasive, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) ("courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

In this case, the Court finds that Plaintiff has not presented any evidence that she was subjected to racial harassment that was sufficiently severe or pervasive to

create a hostile work environment in violation of Title VII. First, as set forth in the facts, above, it is undisputed that Daly did not make any racial remarks to Plaintiff when he was her supervisor and Plaintiff never heard Daly make any racial remarks to anyone. Def. SMF at ¶ 63. Although Plaintiff contends that Daly created a hostile work environment based on her race, she had failed to cite to any evidence that he ever made any reference to her race. Thus, even assuming that Plaintiff's allegation that Daly yelled at her during a meeting could be considered "harassment," she has failed to present any evidence that the alleged harassment was based on her race.

Second, even assuming that Plaintiff's allegations could be viewed as harassment based on her race, she has failed to present evidence that Daly's alleged harassment was so severe or pervasive that it constituted a hostile work environment in violation of Title VII. Plaintiff alleges that Daly "subjected me to a hostile work environment when he changed me from audits to disability and patient request without training and moved my desk to a corner, facing the wall." Pl. EEOC Charge, attached to Compl. [2], at 8. During Plaintiff's deposition, she also complained that Daly created a hostile work environment when he yelled at her during a meeting. *See* Pl. Dep. [62-4] at 166.

Daly's decision to change Plaintiff's work assignments and his decision to move her desk are discussed above in connection with Plaintiff's claim of race discrimination based on disparate treatment. Based on the undisputed evidence set

43

forth above, Defendant has shown that Daly rearranged the Team's desk assignments in an attempt to increase the Team's productivity. Def. SMF at ¶¶ 28-29. It is also undisputed that Plaintiff's new desk assignment was within the Team area with the other Team members, was not in a corner, and had all working equipment necessary for her to perform her work duties. Def. SMF at ¶ 30. Plaintiff has failed to cite to any record evidence that Daly's decision to change her work assignments, or his decision to move her desk, had anything to do with Plaintiff's race.

Moreover, the undisputed evidence also shows that, even assuming that Daly "yelled" at Plaintiff during a meeting on one occasion, that incident also did not relate to Plaintiff's race. Based on Miley's interviews of Daly and other employees, Miley concluded that both Plaintiff and Daly acted inappropriately during a team meeting when he and Plaintiff disagreed over the use of a coversheet in processing; but no one, including Plaintiff, indicated that Daly made any comments regarding Plaintiff's race. Def. SMF at ¶ 62. Miley later had a conversation with Daly about his behavior during the team meeting and acting more professionally. Def. SMF at ¶ 62. Daly did not make any racial remarks to Plaintiff when he was her supervisor and Plaintiff never heard Daly make any racial remarks to anyone. Def. SMF at ¶ 63.

In sum, Plaintiff has failed to show that Daly's alleged "harassment" of her was based on race, and further, she has failed to show that he subjected to her to harassment that could be considered either severe or pervasive, such that he created

a hostile work environment under Title VII. Plaintiff's allegations that Daly moved her desk, changed her work assignments, and yelled at her once during a meeting simply do not rise to the level of severe or pervasive harassment, even when viewed in the totality of circumstances. *See, e.g.*, *McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (several instances of racially derogatory slurs, extending over a period of more than two years, did not constitute severe or pervasive harassment); *Mendoza*, 195 F.3d at 1247 (five or six harassing incidents over an eleven-month period were not sufficiently severe or pervasive to create a hostile work environment).

Thus, viewing the facts in the light most favorable to Plaintiff, the Court finds that she has failed to present sufficient evidence to create a genuine issue of fact as to whether she was subjected to severe or pervasive harassment based on her race that constituted a racially hostile work environment under Title VII. Accordingly, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [62] be **GRANTED** as to Plaintiff's claim of race discrimination based on a hostile work environment.

2.    Retaliation

In the Complaint, Plaintiff alleges that CIOX unlawfully retaliated against her in violation of Title VII. *See* Compl. [2] at 4. She alleges that, after she complained about discrimination, she was retaliated against on September 28, 2016, and

November 7, 2017 "in the form of written actions." *Id*. at 6. In her EEOC Charge, she alleges that she "began complaining to Human Resources [about Daly] around August 31, 2016," and that she "filed a formal written complaint on September 24, 2016." Pl. EEOC Charge, attached to Compl. [2], at 8. Plaintiff alleges further that, on December 14, 2016, Thomas informed her that she was suspended, and on December 20, 2016, Thomas and Spivey (now Miley) informed her that her employment was terminated. *Id*. Plaintiff alleges that CIOX unlawfully retaliated against her for her complaints about discrimination, in violation of Title VII. *Id*.

In general, proof of unlawful retaliation is governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at

1525-1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601.

### a.   Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation under Title VII, a plaintiff must generally show that: (1) she engaged in a protected activity or expression; (2) she received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

In this case, there is no dispute that Plaintiff suffered an adverse employment action when her employment was terminated on December 20, 2016. *See* Def. Br. at 18; Def. SMF at ¶ 109. Defendant argues, however, that, Plaintiff did not engage in a protected activity until she made a complaint about Daly on October 13, 2016; and further, that she has failed to present any evidence of a causal link between her alleged protected activities and her termination. Def. Br. at 16-20. Defendant also argues that, even if Plaintiff had established a *prima facie* case of retaliation, it has

presented sufficient evidence that it had a legitimate reason to terminate Plaintiff's employment that had nothing to do with her complaints about Daly, and Plaintiff has failed to present any evidence of pretext. *Id*. at 20-22.

(1)    Protected Activity

The first *prima facie* element requires Plaintiff to show that she engaged in a protected activity or expression. A plaintiff alleging unlawful retaliation can show that she engaged in a protected act under Title VII through evidence of either "participation" or "opposition." *See* 42 U.S.C. § 2000e-3(a). An act of participation requires the existence of a Title VII proceeding or investigation. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). The filing of a charge of discrimination with the EEOC generally meets the standard of a protected activity. *See, e.g., Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993).

In this case, Defendant argues that Plaintiff did not engage in a protected activity until she made a complaint about Daly on October 13, 2016. The undisputed evidence, as set forth above, shows that Plaintiff made her first complaint about Daly on or about August 31, 2016 (the August 31 Complaint"). Def. SMF at ¶ 36. On August 31, 2016, after Daly rearranged desks and lowered productivity goals, Plaintiff sent an email to Kristen Griffin, the Regional Director of Operations complaining about Daly's management, the "abuse of authority and the hostile

environment of the Wellstar team," and the "stressful environment" being overwhelming due to Daly and the loss of her father. Def. SMF at ¶ 36. It is undisputed, however, that Plaintiff's August 31 Complaint did not allege that Daly was engaging in discriminatory, retaliatory, or harassing conduct due to her race or any other protected category. Def. SMF at ¶ 37.

On September 10, 2016, Plaintiff made another complaint about Daly ("September 10 Complaint"). Def. SMF at ¶ 40. Plaintiff forwarded an email from Daly about her failing to meet productivity goals to Tim Engelbracht, the Vice President of Operations, again complaining of work stress caused by Daly and the loss of her father, but Plaintiff's September 10 Complaint did not allege that Daly was engaging in discriminatory, retaliatory, or harassing conduct due to her race or any other protected category. Def. SMF at ¶¶ 40-41.

Two days later, on September 12, 2016, Plaintiff made another complaint ("September 12 Complaint"). Def. SMF at ¶¶ 42-44. Plaintiff submitted a complaint to Sharon Spivey (now Miley), the Regional HR Manager at that time, complaining that Daly's hostility and management and the recent death of her father were causing her stress at work, but again, the September 12 Complaint did not allege that Daly was engaging in discriminatory, retaliatory, or harassing conduct due to her race or any other protected category. Def. SMF at ¶¶ 42, 44. After Plaintiff's September 12 Complaint, Miley spoke to Plaintiff to ask for more details, and Plaintiff explained

that Daly instructed her to stop using a coversheet when processing requests, but Plaintiff believed that the coversheet was needed to protect PHI. Def. SMF at ¶ 45. Miley investigated and concluded that Daly's instructions were correct. Def. SMF at ¶ 45.

On October 13, 2016, Plaintiff made another complaint about Daly ("October 13 Complaint"). Def. SMF at ¶ 46. Plaintiff emailed Miley stating that the issues were continuing and "now the problems is [sic] founded in retaliation and grounded in discrimination." Def. SMF at ¶ 46. On October 13, 2016, Miley replied to Plaintiff in email, providing her with the option to email her grievance to her directly and also providing her mailing address if she wanted to mail it. Def. SMF at ¶ 47. She also explained that she had spoken to Daly and his supervisor, Griffin, and confirmed that Daly's instruction regarding the coversheet was correct. Def. SMF at ¶ 47. Plaintiff replied, stating that her complaint was that Daly was abusing his authority, causing a hostile environment, was treating her (an African-American) differently from a White co-worker with respect to productivity standards, and changed her job duties without training. Def. SMF at ¶ 48. Plaintiff stated she would go into more detail in her formal grievance. Def. SMF at ¶ 48. Miley did not receive such formal grievance in the mail or email from Plaintiff, and CIOX does not have a record of receiving such formal grievance sent via certified mail from Plaintiff. Def. SMF at ¶ 49.

Plaintiff took FMLA leave from October 24, 2016, through November 7, 2016. Def. SMF at ¶ 50. After Plaintiff returned to work, Miley met with Plaintiff about her October 13 Complaint. Def. SMF at ¶ 51. Plaintiff alleged that: (1) Daly was showing favoritism to the White employees with respect to productivity standards and overtime pay; (2) Daly was showing favoritism to Hoor Kapadia (who is Asian), another employee on her team, with respect to discipline for sleeping at her desk and/or taking long lunch breaks; (3) Daly interrupted Plaintiff and became upset with her during a team meeting about the use of a coversheet; and (4) Daly changed her job duties from audits to processing medical records without providing training, which caused her to have two unauthorized disclosures ("UADs"). Def. SMF at ¶ 52.

In sum, Defendant argues, although Plaintiff made multiple complaints about Daly, the first complaint that could be considered a protected activity under Title VII was her October 13 Complaint, in which she specifically complained that her problems with Daly were "founded in retaliation and grounded in discrimination." Def. SMF at ¶ 46. The evidence indicates that it was in connection with her October 13 Complaint that Plaintiff first claimed that Daly was treating her (an African-American) differently from a White co-worker with respect to productivity standards. Def. SMF at ¶ 48.

Viewing all evidence in the light most favorable to Plaintiff, the Court agrees with Defendant that the Plaintiff's August and September complaints were not protected activities under Title VII because she did not specifically complain that Daly had subjected the Plaintiff to discrimination on the basis of her race. Nevertheless, the Court finds that Plaintiff has presented sufficient evidence to show that her October 13 Complaint about Daly constituted a protected activity under Title VII. Moreover, the undisputed evidence also shows that Plaintiff complained again about Daly after she returned to work in November of 2016. After Plaintiff's FMLA leave ended on November 7, 2016, and Plaintiff returned to work, she met with Miley and complained that Daly was showing favoritism to the White employees regarding productivity standards, and he also showed favoritism to Hoor Kapadia, with respect to discipline for sleeping at her desk and/or taking long lunch breaks. The Court finds that both of these complaints were protected activities under Title VII. Defendant argues, however, that Plaintiff has failed to show evidence of a causal link between these protected activities and her suspension or termination.

### (2)   Causal Link

For the third and final element of a *prima facie* case of retaliation, a plaintiff must establish that there is a causal link between the protected activity and the adverse employment action. A plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact

prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985); *see also Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991).

Rather, to establish a causal connection, a plaintiff was traditionally required to show that the relevant decision maker was aware of the plaintiff's protected conduct, and that the protected activity and the adverse action "were not wholly unrelated." *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (internal citation and quotations omitted). The Supreme Court has ruled, however, that "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

In order to establish a causal connection between protected conduct and an adverse employment action, however, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir.

2004) ("A plaintiff satisfies this element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("To establish a causal connection, a plaintiff must show that the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.") (emphasis added). As the Eleventh Circuit has stated, this requirement "rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The defendant's awareness of the protected statement, however, may be established by circumstantial evidence. *Goldsmith*, 996 F.2d at 1163.

A plaintiff may establish an inference of causation merely by showing that she suffered the adverse action shortly after she engaged in the protected activity. *Higdon*, 393 F.3d at 1220; *Bass v. Board of County Comm., Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001); *Brungart*, 231 F.3d at 798. For a plaintiff to establish such a link by mere temporal relationship, however, the challenged decision must follow almost immediately after the protected expression to support the logical inference that the two events were related. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity

between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (internal quotes omitted).

The Eleventh Circuit has held that a gap of three months or more between the protected activity and the challenged personnel action, absent any other evidence linking the events, is too long to support the inference that the two events were connected. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period does not rise to the level of "very close" to support an inference of a causal link); *Higdon*, 393 F.3d at 1221 (three-month period does not allow a reasonable inference of causation); *see also Conner v. Schnuck Markets, Inc.*, 123 F.3d 1390, 1395 (10th Cir. 1997) (lapse of four months between protected activity and termination did not support inference of casual connection); *Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (passage of six months between plaintiff's complaint and firing insufficient, without more, to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month gap between filing discrimination complaint and receipt of disciplinary letter did not give rise to inference of causal relation).

Defendant argues that Plaintiff has not presented evidence of a causal link between her protected activities and her suspension and/or termination. Def. Br. at 19-20. Defendant contends that, because Plaintiff's protected activity occurred on

October 13, 2016, and her suspension did not occur until December 15, 2016, and her termination on December 20, 2016, the two-month period between the protected activity and the adverse actions was not short enough to suggest that there was a causal link by temporal proximity alone. *Id*. at 19. Defendant argues further that, even if temporal proximity suggested a causal link, "Plaintiff's intervening gross misconduct breaks any putative causal connection." *Id*.

Defendant is correct that intervening factors may negate a causal link that is otherwise suggested by mere temporal proximity. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272-73 (2001) (when the evidence revealed that the employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed "along the lines previously contemplated, though not yet definitively determined," did not establish evidence of causality)); *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010) ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint."); *Dowlatpanah v. Wellstar Douglas Hosp.*, No. 1:05-CV-2752-WSD-RGV, 2006 WL 4093123, at *14 (N.D. Ga. Dec. 5, 2006) (Vineyard, M.J.) (holding that "temporal proximity, standing alone, may not be sufficient to establish the causal link between them, particularly when the defendant establishes intervening

factors"), *report and recommendation adopted sub nom. Dowlatpanah v. Wellstar Health Sys., Inc.*, 2007 WL 639875 (N.D. Ga. Feb. 26, 2007); *see also Spence v. Panasonic Copier Co.*, 46 F.Supp.2d 1340, 1348 (N.D.Ga. 1999) (Brill, M.J.) (the mere chronological factor alone that the adverse employment action followed the protected activity is insufficient to demonstrate causation).

Nevertheless, as discussed above, viewing all the facts and evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff engaged in a protected activity when she complained about Daly on October 13, 2016, and also when she complained about Daly again when she returned to work after November 7, 2016. It is undisputed that, after her FMLA leave ended on November 7, 2016, and Plaintiff returned to work, she met with Miley and complained that Daly was showing favoritism to the White employees regarding productivity standards, and he also showed favoritism to Hoor Kapadia with respect to discipline for sleeping at her desk and/or taking long lunch breaks. Thus, this second protected activity occurred in or around mid-November of 2016, and Plaintiff was suspended just over one month later on December 15, 2016, and terminated on December 20, 2016. As a result, the Court finds that Plaintiff has presented evidence of a causal link by temporal proximity alone, and she has presented a *prima facie* case of unlawful retaliation under Title VII.

Although the undersigned finds that Plaintiff has established a *prima facie* case of retaliation based on the temporal proximity between her protected activities and the adverse employment action, the Defendant argues further that, even if Plaintiff has established a *prima facie* case of retaliation, CIOX has presented sufficient evidence that it had a legitimate reason to terminate Plaintiff's employment that had nothing to do with her complaints about Daly, and Plaintiff has failed to present any evidence of pretext. Def. Br. at 20-22. The undersigned agrees.

b.    Defendant's Legitimate Reason

CIOX contends that it has presented sufficient evidence that it had a legitimate reason for suspending Plaintiff and terminating her employment. The details surrounding the Plaintiff's suspension and termination are set forth above in the facts. In sum, the Defendant has shown that Plaintiff's employment was terminated after she threatened her co-worker Kapadia on December 15, 2016. Thomas and Miley then conducted an investigation, including interviewing Plaintiff and Kapadia, as well as the employees who witnessed the incident. Def. SMF at ¶ 102. The employee witnesses and Kapadia consistently informed Thomas and/or Miley that Plaintiff approached Kapadia at her desk, initiated the altercation, used threatening body language by standing close or over Kapadia, who was seated at her desk, made a verbal threat to Kapadia about settling the argument outside, and raised her voice. Def. SMF at ¶ 104. Due to the consistent accounts from the witnesses, Thomas and

Miley, who are both African-American, decided to terminate Plaintiff's employment for her misconduct that violated CIOX's Business Ethics and Conduct Policy. Def. SMF at ¶¶ 105-06.

Thus, based on the information obtained by Thomas and Miley during the investigation, the Defendant has shown that it had a legitimate reason to terminate Plaintiff's employment that was unrelated to her complaints about Daly. Accordingly, the Court finds that Defendant has presented evidence that CIOX had a legitimate reason for terminating Plaintiff's employment. In order to defeat the Defendant's Motion for Summary Judgment, Plaintiff must cite to admissible record evidence sufficient to show that Defendant's proffered reasons were pretextual.

### c.    Pretext

A plaintiff may carry the burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence

establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

A plaintiff may carry her burden of establishing pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830.

If the employer offers more than one legitimate, non-discriminatory reason, the plaintiff must rebut each reason. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (*en banc*). Moreover, in order to establish that the employer's

reasons were pretextual, a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason.*" Brooks v. Cty. Comm. of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

In this case, the Plaintiff has not cited to any evidence suggesting that the Defendant's reasons for terminating her employment were pretextual. Although Plaintiff filed a brief in response to the Defendant's Motion for Summary Judgment, she does not address this issue at all, or cite to any record evidence that disputes the Defendant's factual contentions surrounding her suspension and termination. *See* Pl. Br. [64] at 2. Plaintiff states only that she relies on the "oral testimony" of witnesses Anne Hooker, Candise Slaton, Adrienne Holloman, Felicia Blanchard, Jasemine Smith, Kathy Manzanarez, Narcissus Elder, Tanya Lee, and Michael Patton. *Id*. But Plaintiff does not cite to any affidavits or deposition transcripts from these alleged witnesses, nor does she attach any evidence to her brief. Thus, it is not clear what testimony from these witnesses would indicate that the Defendant's proffered reason for terminating Plaintiff's employment was pretextual.

Thus, at most, Plaintiff has shown only that she disagreed with Defendant's decision to terminate her employment. The Eleventh Circuit has repeatedly held, however, that a plaintiff cannot establish pretext by merely questioning the wisdom of the employer's decisions or business judgment in managing its employees. *See*,

*e.g.*, *Rojas v. State of Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002) (Title VII does not permit courts to sit in judgment of "whether a business decision is wise or nice or accurate"); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as he reason is one that might motivate a reasonable employer); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) ("[f]ederal courts do not sit to second-guess the business judgment of employers"); *Shealy v. City of Albany*, 89 F.3d 804, 806 n.6 (11th Cir. 1996) (court "does not sit as a sort of 'super personnel officer . . . correcting what the judge perceives to be poor personnel decisions"); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (the court does "not sit as a super-personnel department that reexamines an entity's business decisions . . . no matter how mistaken"); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.").

In sum, Plaintiff has not cited to any record evidence showing that the Defendant's reason for her termination was pretextual. She has not shown that the reason for her termination had no basis in fact, that it was not the true factor motivating the decision, or that the stated reason was insufficient to motivate the decision to terminate her employment. Accordingly, the Court **RECOMMENDS**

that Defendant's Motion for Summary Judgment [62] be **GRANTED** as to Plaintiff's retaliation claim.

## III.   RECOMMENDATION

For the reasons discussed above, **IT IS RECOMMENDED** that the Defendant's Motion for Summary Judgment [62] be **GRANTED** and that judgment be entered in favor of Defendant on all of Plaintiff's claims.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 12th day of November, 2019.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE